JOHN C. GREER v. JOHN CANFIELD.

FILED NOVEMBER 8, 1893.   No. 4655.

38  169
49  743

1. Arbitration and Award: A VERBAL SUBMISSION of the matters in controversy between parties, who appear voluntarily, and testify themselves, and produce witnesses in support of their respective claims, will, if fairly conducted, be sustained after the making of the award.

2. ———: FAILURE TO SWEAR ARBITRATORS AND WITNESSES. The fact that neither the witnesses nor the arbitrators were sworn, when no objection is made on that ground, will not invalidate the award.

3. Review. The claim that the award was made on Sunday, *held* not sustained by the proof.

4. Action on Award: DEFENSE. Where matters in controversy are submitted to arbitrators, proof taken, and an award made, and an action brought thereon, an answer which fails to show that the arbitrators exceeded their powers, or did not consider some of the matters submitted, or did an injustice to the defendant, fails to state a defense.

ERROR from the district court of Johnson county. Tried below before BROADY, J.

*S. P. Davidson,* for plaintiff in. error.

*D. F. Osgood, contra.*

MAXWELL, C. J.

This is an action upon an award. There are three defenses set up in the answer : First, a denial that arbitrators were appointed, or that the submission was in writing; second, that the award was made on Sunday; third, that an uncle of the defendant was officious in conference with the arbitrators. On the trial of the cause the jury returned a verdict in favor of the plaintiff below in the sum of $468.67, on which judgment was rendered. It is doubtful if the answer states any defense, but as no question is raised upon it, the court, on its own motion, will treat it as sufficient. The mode of submission is stated by O'Connell, one of the arbitrators, as follows :

Q. Did they state, or did any one state, in their presence at that time, that you were to decide all matters of difference between them?

A. Why, I don't know that those words were used, but that is the way I understood it.

Q. As a matter of fact you did not undertake to go through their whole business transactions?

A. We undertook everything they laid before us.

Q. Their whole business transactions you did not go through?

A. I suppose they laid all before us that they wanted us to settle, and we passed on all, except a few things spoken of in this Exhibit "A."

Q. No articles mentioned that you were to settle?

A. Not at that meeting. After we began, Hedrick wrote down notes, and goods, and horses, etc., and he wrote them

down on a piece of paper.   We got to work; took the first item,—such a note.   If they both agreed on that, we took that.   Then there were several articles they could not agree on, and one said one thing and another another, and we would have to have evidence.   We took off everything they agreed on, and there were things they didn't agree on, and we decided them.

Q. You never gave a written decision other than that ?

A. That is all the decision we ever made.   I believe we wrote two, one for each party.

Q. You never decided each one of these items and notified them?

A. No, sir ; but we did settle each item.   There would be such a note they agreed on—for instance, the price of a horse they could not agree on; and then there were several other things.   We decided these things separately and then added up the amount, and that is the way we arrived at the conclusion.

Q. You never notified Greer?

A. No, sir; we didn't.

Q. Now, as a matter of fact, didn't Greer ask you for an itemized list of them ?

A. Yes; I met him Sunday afternoon, and there was one account he asked me how we arrived at.   I said, "If there is any particular thing, I think I can remember it." There were some $2,000 John collected, and he asked what commission we allowed.   I said, we allowed him five per cent.   He wanted fifteen per cent and had that charged up; and he found a good deal of fault with that, and appeared wrathy, and he wanted an itemized statement.

Q. You got pretty wrathy yourself?

A. Well, slightly.   I says, " If there is any made, Hedrick will make it."   I told Hedrick, and he didn't make it; at least he told me he didn't.

Q. Greer asked an itemized account of your decision?

A. Yes, he did.

Q. And you refused to furnish it?

A. Well, I didn't furnish it.

Q. And Hedrick didn't furnish it?

A. I think not, at least he told me he hadn't.

Q. By the court: You have been county judge in this county, have you?

A. Yes.

Q. That was back in roller-skate time, was it?

A. Yes.

Q. By Mr. Davidson: When you began this first session of this arbitration did you and Mr. Hedrick take any oath?

A. No, it was all irregular as far as that was concerned. I spoke about that. We went over as friends, just as a court and jury, friendly until the thing was over.

Q. You never took any oath?

A. No, sir; we never administered an oath to the witnesses; we just heard their story and tried to use common sense in deciding it.

Mr. Greer testifies on the same subject:

Q. You say at the time you first met it was agreed that all the difference between you and Canfield should be settled by the arbitrators?

A. Yes.

Q. Were you present at the time of this debtor and credit business?

A. Yes.

Q. That was especially spoken of at that time as to being settled?

A. Yes.

Q. Were there any items spoken of at that time especially to be settled by them?

A. If anything come up I had not credited Canfield with, I told them if he would bring evidence there I would allow on the statement. I thought there were some items I had not credited him with, as I didn't keep a correct account. I would allow all these accounts, and if I owed him anything I would pay it, that was not on the statement.

Q. That was said there at that time, was it?

A. Yes.

Q. They were to consider these when they come up at that time?

A. Yes.

Q. Any other items you had not credited him with or debited him with were to be considered in arbitration in addition to the list or itemized account you had furnished him?

A. Yes.

Q. Now you agreed that O'Connell and Hedrick should be arbitrators?

A. Well, I did, for there was no other chance to get a settlement out of him. I simply did it. I was more than anxious to get it settled, and that is the only way they wanted to settle.

Q. You thought they were good men, didn't you?

A. Yes; I had no reason—well, I knew one was a friend to me and the other was not an enemy, and I didn't think they would do me injustice.

Q. You don't think they would, do you?

A. I don't know whether they would or not.

Q. You say when Canfield came out he simply asked you how you liked the award?

A. Yes.

Q. And you told him you didn't know how it was yet?

A. Yes.

Q. That you had not the items that were settled?

A. Yes.

Q. He didn't ask you to pay it?

A. No, sir.

Q. When was it he was out there?

A. I think about three days after Sunday, probably two or three days.

Q. Probably Tuesday or Wednesday, probably about March 5?

A. Yes, I think about March 5.

Q. How long was he in the bank?

A. Probably a minute or two minutes.

Q. Any one else present?

A. Yes.

Q. Who?

A. Mr. Russell.

Q. That is your father-in-law?

A. Yes, and I think some one else.

Q. Did he say anything to him about the award?

A. He and I had all the talk there was about it.

Q. They discussed it, did they?

A. Yes, a few words were spoken about it. I don't remember what they were.

Q. You submitted all the matters you wanted to to the arbitrators, didn't you? They didn't refuse to hear anything you wanted them to?

A. No; I don't think they refused to hear; but they refused to render their decision to things I wanted them to.

Q. What was it?

A. One note.

Q. The Sharrett note, was that?

A. Yes.

Q. Didn't you and Canfield finally agree that they should not decide that?

A. We did about that. They said they would not decide that.

Q. You and Canfield then agreed they should not decide that?

A. Yes.

Q. Also the tank?

A. Yes.

Q. You agreed they should not pass upon these two items?

A. I agreed to that, for they would not; didn't seem to want to.

Q. All the other matters you submitted they passed upon?

A. Yes.

This was a good common law arbitration. The matters in dispute between the parties, except the two items withdrawn by consent, were submitted to the arbitrators and a settlement made. The account seems to have been very much complicated and carelessly kept, so that the mode adopted by the arbitrators to do justice between the parties was proper and calculated to elicit the truth. The fact that the witnesses were not sworn is not sufficient to justify the setting aside of the award. Other testimony was taken without objection and treated by the parties and the arbitrators as truthful, and no objection even now is made that any witness testified to what was untrue. The defense that the arbitration was made on Sunday is not borne out by the testimony. It is true the arbitrators, on Sunday, to accommodate the plaintiff in error, heard some explanations in his behalf in regard to some part of his claim; but he cannot very well insist that the arbitration is void for that cause. It may well be doubted whether, if all that is claimed in the answer is true, the award will be void; and no sufficient cause is either pleaded or proved for setting the award aside. This is a common law award, and a submission made by either party, either by word or deed, is sufficient. If the submission is by word, there is no remedy to recover on the award except by action; but the award, if fairly made within the scope of the matters submitted, will be valid and binding. (*Tynan v. Tate*, 3 Neb., 388.) There is no error in the record and the judgment is

AFFIRMED.